**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 11, 2012

# In the Court of Appeals of Georgia

A12A0080. WRIGHT v. COFIELD et al.                      DO-003

DOYLE, Presiding Judge.

This appeal arises from a business dispute between Carl Wright and several Defendants, including Charles Cofield and Russell Neuman. The trial court granted summary judgment to the Defendants on the ground that the alleged oral contract was too vague to be enforceable. For the reasons that follow, we affirm in part and reverse in part.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all

reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant[1].

So viewed, the record shows that Wright has worked in the color and fabric business since 1977, with experience in both sales and operations. Wright became acquainted with Neuman around 1987 at an industry conference. Over the next several years, Wright and Neuman discussed starting a color- concentrate business, although the parties were unsuccessful in securing funding and never consulted an accountant or an attorney. Meanwhile, in July of 1995, Wright assumed a managerial position at American Extrusions (later known as Innovative Fibers), where he managed their color-compounding operations and eventually ascended to the rank of general manager, earning in excess of $160,000 per year.

In the spring of 2000, Neuman first informed Wright about Cofield's possible interest in financing a start-up venture. In June of that year, while he was still employed by Innovative Fibers, Wright met Cofield for the first time and, over several conversations, discussed the possible formation of a company with Cofield

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

2

and Neuman ("2000 Agreement"). At one of these meetings, Cofield proposed that Wright and Neuman run the new company.

Wright deposed that as an inducement to leave their employment, Cofield offered Wright and Neuman each 15 percent of the "net proceeds" of "whatever the value of the company was in a potential sale." The 2000 agreement was not memorialized in writing. Wright agreed to a set salary per year, with the potential for bonuses, and he received health insurance but no other benefits. .

As Wright understood it, he was a partner in the company along with Cofield and Neuman from the inception of the company. Nevertheless, Wright understood that Cofield was the legal owner of 100 percent of the company as a legal entity and had the power to determine Wright's salary and employment status. Furthermore, Wright understood that he would receive no other financial incentive unless the company was sold.

Later that summer, as they made preparations for the new company, Wright, Cofield, and Neuman sought legal advice regarding the venture and arranged a meeting with Cofield's attorneys. At this meeting, they were advised to form two companies – C/A Manufacturing and C/A Technologies ("the Company") – in order to protect against potential legal claims from Neuman's previous employer.

Wright gave notice to Innovative Fibers at the beginning of August and started working at C/A Manufacturing on September 1. Wright primarily handled the manufacturing aspects of the operation, while Neuman was responsible for sales. Early on, Neuman became the liaison between the Company and Cofield, and Wright primarily communicated with Neuman, who then relayed updates about the manufacturing side of the business to Cofield.

Beginning in 2000 and continuing until the eventual sale of the Company in 2005, Cofield fielded several purchase offers from prospective buyers, including Magenta Master Fibers and Americhem. During more than one of Cofield's communications with the president of Americhem, he stated that he wanted a portion of any potential sale to go to Neuman and Wright, and several documents support this. Americhem's president negotiated with the understanding that Wright and Neuman would receive a share of the proceeds from the sale. Similarly, during negotiations with Magenta, both Neuman and defendant Kevin Harris, the chief financial officer of the Company, operated under the assumption that 30 percent of the company was reserved for Neuman and Wright.

On February 11, 2002, the two C/A companies merged to create Old Cat, Inc., with Cofield retaining 100 percent of the Company's stock. That Spring, Wright

4

requested an increase in salary and benefits, communicating this in writing to Neuman, who then passed the message on to Cofield. Cofield granted Wright's request a few weeks later, but in doing so, he also decided that Wright would not receive "any kind of bonus" if the Company sold, but did not inform Wright directly of this decision.

On December 5, 2005, Americhem purchased Old Cat's assets, including intellectual and physical property developed and contributed to by Wright. Portions of the $8.73 million proceeds from the sale were distributed to the various Defendants, including Neuman, but Wright received nothing. Wright had repeatedly asked Neuman about the payout of the proceeds, and Neuman told him he knew nothing about the division of proceeds, although Neuman received a promissory note for his share of the proceeds a week prior to the sale.

Wright brought suit in 2009, alleging claims of breach of contract, tortious interference with contractual relations, conversion, breach of fiduciary duty, aiding and abetting conversion, civil conspiracy, monies had and received, unjust enrichment, quantum meruit, attorney fees, and punitive damages. In March 2011, the trial court granted summary judgment to the Defendants, and Wright appeals.

1. As an initial matter, Wright "dropped" his claims of tortious interference with contractual relations, quantum meriut, and unjust enrichment, on which claims the trial court granted summary judgment to the Defendants. Although Wright did not actually dismiss these claims, he did not appeal the trial court's summary judgment grant as to these counts, and therefore, we affirm the grant of summary judgment to the Defendants as to these claims.

2. Wright contends that the trial court erred by finding that the oral contract promising him 15 percent of the net proceeds of the sale of the business was unenforceable as a matter of law. We agree and reverse.

Although generally contract disputes may be well suited for summary judgment adjudication because construction of contracts is ordinarily a matter of law for the court, in this instance the first significant issue is not the contract's construction, but whether the contract existed at all as a matter of fact. The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact. In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the

6

making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.[2]

Thereafter, "the next question is whether they reached a verbal agreement as to all essential terms."[3]

Here, Wright's testimony and the documents regarding the unconsummated sales of the company between 2000 and 2005 raise a material issue of fact as to whether he was entitled to 15 percent of the net proceeds of the sale of Old Cat, Inc.[4] The trial court erred by finding that "success" of the company was a condition

---

[2] (Punctuation and citations omitted.) *McKenna v. Capital Resource Partners, IV*, 286 Ga. App. 828, 832 (1) (650 SE2d 580) (2007).

[3] Id. at 833 (2). See also OCGA §§ 13-3-1; 13-3-2.

[4] See *Dye v. Mechanical Enterprises, Inc.*, 308 Ga. App. 311, 314-315 (708 SE2d 24) (2011) (jury question as to issue of commission computation, both of which were sufficiently definite to survive summary judgment). See also *Cox v. Erwin*, 246 Ga. App. 439, 441 (2) (541 SE2d 69) (2000) (60 percent of net profit sufficiently definite to survive summary judgment); *Harrell v. Deariso*, 82 Ga. App. 774, 778 (62 SE2d 434) (1950) (difference between gross sales price and $11,000 was sufficiently definite); *Cary v. Neel*, 54 Ga. App. 860, 861 (189 SE 575) (1936) (five cents per ton of gravel sold not indefinite); *Phillips v. Hudson*, 9 Ga. App. 779, 780-781 (2) (72 SE 178) (1911) (promise to pay as a bonus a certain percentage of a company's net earnings was definite and enforceable). Compare with *Christensen v. Roberds of Atlanta, Inc.*, 189 Ga. App. 289, 291-292 (2) (375 SE2d 267) (1988) (promise to pay a bonus of $ 7,000 to $ 8,000 per year not enforceable).

precedent that barred Wright's claim as a matter of law or that the failure of the parties to define the term "success" rendered the agreement too vague to be an enforceable oral agreement.[5] Wright testified that this meant simply that if the company was not successful a sale would not occur. That testimony coupled with the evidence that Neuman received his portion of the net proceeds of the sale, and the documents discussing Wright's raise and its effect on whether he would receive a portion of the proceeds of the sale, could support a finding that the parties mutually assented to the alleged contract. Therefore, the trial court erred by ruling that the alleged contract was unenforceable as a matter of law.

3. The Defendants argue that we should affirm the trial court on the basis of "right for any reason" because Cofield could change the terms of Wright's at-will employment at any time. We disagree. Cofield could only make "prospective changes" in Wright's terms of employment after providing notice, about which a question of fact exists here.[6]

---

[5] See *Transkey, Inc. v. Adkinson*, 225 Ga. App. 457, 460-461 (2) (484 SE2d 30) (1997) (question of fact as to whether a condition precedent existed in oral employment contract).

[6] See *Cox*, 246 Ga. App. at 440 (2).

4. Finally, based on our holding in Division 1 we reverse the trial court's grant of summary judgment to the Defendants on Wright's claims for conversion, civil conspiracy, money had and received, breach of fiduciary duty, attorney fees, and punitive damages because it erroneously determined that no underlying enforceable agreement existed.

*Judgment affirmed in part; reversed in part. Andrews and Boggs, JJ., concur.*

Decided July 11, 2012.

Contract. Whitfield Superior Court. Before Judge Partain.

Locke Lord, Adamson B. Starr, John H. Williamson, for appellant.

Coppedge & Evans, Warren N. Coppedge, Jr., Joseph B. Evans, Stephen Michmerhuizen, Carlock, Copeland & Stair, Johannes S. Kingma, Peter F. Boyce, Catherine M. Packwood, William W. Keith III, for appellees.