**SECOND DIVISION**
**BARNES, P. J.,**
**DOYLE, P. J. and MILLER, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 8, 2013**

# In the Court of Appeals of Georgia

A13A1195. BEDSOLE v. ACTION OUTDOOR ADVERTISING DO-019
    JV, LLC, et al.

DOYLE, Presiding Judge.

Benjamin K. Bedsole filed suit against Action Outdoor Advertising JV, LLC, Steve Galberaith, John A. Hartrampf, Jr., Laurence T. McCurdy III, Galberaith Holdings, LLC, Hartrampf Holdings, LLC, and McCurdy Holdings, LLC, (collectively, "the defendants"), alleging that the defendants orally agreed to pay him for an equity interest in millions of dollars of billboard assets. Bedsole's claims, as amended, include breach of contract, quantum meruit, unjust enrichment, promissory estoppel, breach of fiduciary duty, and punitive damages. The trial court granted summary judgment to the defendants, and Bedsole appeals. For the reasons that follow, we affirm in part and reverse in part.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] Summary judgment is proper if the defendants "present[] evidence negating an essential element of the plaintiff's claims or establish[] from the record an absence of evidence to support those claims. If [the] defendant[s] establish[] those requirements, the plaintiff must point to specific evidence giving rise to a triable issue."[2] The appellate court conducts a de novo review of an order granting or denying a motion for summary judgment, viewing "the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[3]

So viewed, the record shows that in 1998, Galberaith, McCurdy, and Hartrampf formed H.G., LLC, which sold advertising space on existing billboards that the

---

[1] OCGA § 9-11-56 (c).

[2] (Citation and punctuation omitted.) *Thompson v. Floyd*, 310 Ga. App. 674 (713 SE2d 883) (2011), quoting *Oglethorpe Dev. Group v. Coleman*, 271 Ga. 173, 173 (1) (516 SE2d 531) (1999).

[3] (Citation and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

owners contributed to the company. The company also constructed, operated, and maintained additional billboards and sold billboard inventory. Pursuant to H.G.'s operating agreement, each of the men owned a one-third interest, no one member could bind the company, and "a person [could] be admitted as an additional member by the unanimous vote of the other members and the new member's consent in writing to be bound by this agreement." In 2000, H.G. became Action Outdoor Advertising JV, LLC ("Action Outdoor").

In 1998 , Bedsole became associated with H.G. as an independent contractor; his job responsibilities included "handl[ing] billboard sales, display sales, advertising contracts, artwork[,] production[,] and collections." According to Bedsole, in 2000, McCurdy, Hartrampf, and Galberaith asked him to work with them in exchange for "a monthly check to live on" and a "'subordinated'" interest in Action Outdoor. Bedsole understood that his "ownership interest would be realized when . . . billboard inventory [was sold]," and he "would be paid for [his] subordinated interest by taking the total value of a deal sold less the costs associated with the deal and multiplying that amount by [five percent] in the year 2000, [six percent] in . . . 2001, [seven percent] in . . . 2002, [eight percent] in . . . 2003, [nine percent] in . . . 2004[,] and [ten percent] in . . . 2005 and thereafter."

Sometime in 2000, , Action Outdoor presented Bedsole with a written, one-page proposed "Letter of Agreement" and requested that he sign it. In the document, Action Outdoor proposed to provide Bedsole with "a subordinated interest as long as he remained an employee or exclusive independent contractor for Action Outdoor." The subordinated interest began at five percent on June 1, 2000, and increased annually by one percent until reaching a maximum of ten percent on June 1, 2005. The document further provided:

> The subordinated interest becomes a reality only in the event the outdoor advertising sign inventory owned by Action Outdoor Advertising JV, LLC. is sold to an unrelated third party. The formula for calculating the pay-out amount due [Bedsole] was agreed as follows:

> Sale Price
> Less: *Original Development Cost*
> Net Profit
> Times: *% of Interest*
> Pay-Out Amount

> In the event [Bedsole] leaves the employment of Action Outdoor or is no longer operating as an exclusive independent contractor on their behalf, the subordinated interest immediately expires and all rights to such interest are forfeited.

4

The proposed agreement also provided that Bedsole's "annual base salary/compensation is $60,000 with a 5 [percent] increase due each anniversary period thereafter until June 1, 2005[,] at which time the compensation arrangement will be reviewed." The proposal did not define "subordinated," "interest," "pay-out amount," "development cost," or "sign inventory." Because he was concerned that the proposed agreement would permit Action Outdoor to unilaterally terminate his ownership interest in the billboard assets that he helped develop, Bedsole refused to sign it.

From 2000 to 2010, Action Outdoor sold signs in multiple separate transactions, and it compensated Bedsole following each one; the deals included the sale of both existing signs and unbuilt signs (leases and permits). According to McCurdy, Action Outdoor determined Bedsole's compensation using the proposed agreement "as a guideline," which it "followed . . . not exactly but closely." McCurdy explained that Action Outdoor

> didn't use all the costs that were associated with each deal when we determined what [Bedsole] got paid. We actually gave him more than he should have gotten in some instances. . . . [W]e never included office expenses, we never included car expenses, we never included deferred salaries that we never took. There's lots of other things that . . . we didn't include.

5

Bedsole, on the other hand, states that his equity payments following billboard sales "were always calculated based upon the formula in the 'Letter of Agreement.'" Various documents, both formal and informal, associated with the deals referred to Bedsole as equity holder or calculated equity payments due to Bedsole as a result of the sales.[4]

In 2010, Action Outdoor paid Bedsole compensation for transactions the parties refer to as "DeKalb I" and "DeKalb II," which included all remaining sign inventory, as well as leases, easements, and permits related thereto. Action Outdoor reduced Bedsole's compensation for DeKalb I and II based on unpaid lease rental expenses associated with some of the assets. The DeKalb I and II deals closed on September 13, 2010. Action Outdoor terminated Bedsole on September 15, 2010.[5]

---

[4] For example, a December 2006 handwritten note addressed to Hartrampf and McCurdy included the calculations for Bedsole's "[e]quity [p]ayout" following two deals. A separate, typed document titled, "SUMMARY – BEN'S RECAP – OLYMPUS SALE – SEPTEMBER 2010," contains a calculation of the equity payout due to Bedsole based on the purchase price minus the development cost, multiplied by ten percent. A 2004 asset purchase agreement for the sale of billboard structures to Olympus Media, LLC, lists Bedsole as an equity holder, along with McCurdy, Galberaith, and Hartrampf. An April 2006 handwritten note regarding the "Leeds" signs contains a calculation of the equity payment to Bedsole based on the sales price, minus the cost to build, times Bedsole's ten percent equity amount.

[5] Action Outdoor paid Bedsole severance through November 15, 2010.

In 2011, Hartrampf Holdings, LLC, Galberaith Holdings, LLC, and McCurdy Holdings, LLC ("the Holding Companies"), entered into a contract – "DeKalb III" – to sell to Clear Channel Outdoor billboard permits and to assign leases and easements acquired from Action Outdoor. In June or July of 2011, McCurdy called Bedsole regarding his compensation and "threw out" a figure of $875,000, which was ten percent of the DeKalb III deal.[6] Ultimately, however, neither the Holding Companies nor Action Outdoor paid Bedsole in connection with the DeKalb III transaction, explaining thereafter that the companies had no contractual obligation to do so; Bedsole was no longer an independent contractor providing services to any of the defendants; the sale did not involve existing structures or "sign inventory"; and Bedsole did not provide any services associated with the transaction. Instead, Action Outdoor offered Bedsole $150,000 from the DeKalb III transaction, labeling it as an offer of "additional severance pay"; Bedsole did not accept the offer.

---

[6] Action Outdoor was involved in litigation regarding its ability to construct billboard signs in portions of unincorporated north Fulton County, which areas later became newly formed cities. According to McCurdy, Bedsole paid ten percent of the legal fees associated with the Fulton County deal through August 2010. On June 13, 2011, the Supreme Court of Georgia ruled in favor of Action Outdoor, affirming the trial court's grant of summary judgment to Action Outdoor regarding its ability to obtain billboard permits and construct billboards in those cities. See *Fulton County v. Action Outdoor Advertising, JV*, 289 Ga. 347 (711 SE2d 682) (2011).

On March 7, 2012, Bedsole filed suit against the defendants seeking to recover his share of the equity related to the DeKalb III transaction, as well as sums he alleges he should have received in his equity payout related to DeKalb I and II. Bedsole's claims alleged in his initial and subsequent amended complaints include breach of contract, quantum meruit, unjust enrichment, promissory estoppel, breach of fiduciary duty, and punitive damages. The defendants filed a motion for summary judgment as to all of Bedsole's claims. Following a hearing, the trial court granted the motion in a two-sentence order.[7] This appeal followed.

1. *Breach of contract*. Bedsole contends that the trial court erred by granting summary judgment to the defendants on his claim for breach of contract. We agree.

"Georgia contract law requires a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon."[8] "A

---

[7] The trial court also granted Bedsole's motion for summary judgment as to the defendants' counterclaims and a motion to strike filed by the defendants. Those portions of the order are not at issue in this appeal.

[8] (Citation and punctuation omitted.) *Athens Heart Center v. Brasstown Valley Resort*, 275 Ga. App. 607, 608 (621 SE2d 565) (2005), citing OCGA § 13-3-1.

contract may be enforceable even though it rests only in words as remembered by the witnesses."[9]

> To determine whether the parties mutually assented to all essential terms of the contract, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.[10]

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and

---

[9] (Punctuation omitted.) *Jones v. White*, 311 Ga. App. 822, 826 (1) (a) (717 SE2d 322) (2011). See also *Turner Broadcasting System, Inc. v. McDavid*, 303 Ga. App. 593, 577-578 (1) (693 SE2d 873) (1) (2010) (collecting cases recognizing the validity of oral agreements).

[10] (Punctuation omitted.) *Thompson v. Floyd*, 310 Ga. App. 674, 681 (2) (713 SE2d 883) (2011).

9

is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.[11]

Such evidence exists here.

Therefore, "the next question is whether [the parties] reached a verbal agreement as to all essential terms."[12] "The law does not favor destroying contracts on the basis of uncertainty, and a contract that may originally have been indefinite may later acquire more precision and become enforceable because of the subsequent words or actions of the parties."[13]

Here, given the aforementioned evidence of the parties' understanding of their agreement, including their actions after Bedsole failed to sign the proposed Letter of Agreement, as well as the documents in the record detailing Action Outdoor's computation of Bedsole's compensation following each deal, there are genuine factual issues as to whether "the contract's subject matter was established, the parties'

---

[11] (Punctuation omitted.) *Turner Broadcasting System*, 303 Ga. App. at 597 (1).

[12] (Punctuation omitted.) *Wright v. Cofield*, 317 Ga. App. 285, 288 (1) (730 SE2d 421) (2012), quoting *McKenna v. Capital Resource Partners, IV*, 286 Ga. App. 828, 833 (2) (650 SE2d 580) (2007).

[13] (Punctuation omitted.) *Reebaa Constr. Co. v. Chong*, 283 Ga. 222, 223 (1), (657 SE2d 826) (2008).

10

consideration was definite, and the parties' mutual assent to all terms was complete."[14] Accordingly, the trial court erred by granting summary judgment to the defendants on Bedsole's claim for breach of contract.

2. *Promissory estoppel*. Next, Bedsole argues that the trial court erred by granting summary judgment to the defendants on his claim for promissory estoppel. Again, we agree.

"The objection of indefiniteness may be obviated by performance and acceptance of performance."[15] Therefore,

> even if the contract in this case could be considered too indefinite to enforce, a party may enter into a contract invalid and unenforceable, and by reason of the covenants therein contained and promises made in connection with the same, wrongfully cause the opposite party to forego a valuable legal right to his detriment, and in this manner by his conduct waive the right to repudiate the contract and become estopped to deny the opposite party any benefits that may accrue to him under the terms of the agreement.[16]

---

[14] *Thompson*, 310 Ga. App. at 681-682 (2). See *McKenna*, 286 Ga. App. at 833-834 (2); *Toncee, Inc. v. Thomas*, 219 Ga. App. 539, 542 (2) (466 SE2d 27) (1995).

[15] (Punctuation omitted.) *Thompson*, 310 Ga. App. at 682 (3).

[16] *Reebaa Constr. Co.*, 283 Ga. at 224 (2).

"The elements of the equitable doctrine of promissory estoppel are that the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right."[17]

Here, Bedsole worked for Action Outdoor to help effectuate various sales transactions and paid a portion of the expenses, and as admitted by Hartrampf and McCurdy, the parties acted as if the letter agreement was in effect, and it was reasonable for Bedsole to expect that his equity compensation would be consistent with the formula set forth therein. Under these circumstances, the trial court erred by granting the defendants' motion for summary judgment on Bedsole's promissory estoppel claim.[18]

3. *Quantum meruit and unjust enrichment.* Bedsole also challenges the trial court's grant of summary judgment to the defendants as to his claims for quantum meruit and unjust enrichment.

OCGA § 9-2-7 provides that "[o]rdinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is

---

[17] *Thompson*, 310 Ga. App. at 682 (3).

[18] See id; *Ambrose v. Sheppard*, 241 Ga. App. 835, 837 (528 SE2d 282) (2000).

implied to pay the reasonable value thereof." A claim of quantum meruit requires proof that "(1) the provider performed as agent services valuable to the recipient; (2) either at the request of the recipient or knowingly accepted by the recipient; (3) the recipient's receipt of which without compensating the provider would be unjust; and (4) provider's expectation of compensation at the time of rendition of services."[19] "The theory of unjust enrichment is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay."[20]

Here, assuming that it found that there was no contract between the parties, genuine issues of fact remain as to whether, with regard to DeKalb I and II, Bedsole provided services that benefitted Action Outdoor and were either requested or knowingly accepted by it; whether Bedsole expected to be compensated at the time he rendered the services; and whether Action Outdoor's acceptance of his services without paying him would be unjust.[21] Bedsole has not, however, pointed to any

[19] See *Hollifield v. Monte Vista Biblical Gardens, Inc.*, 251 Ga. App. 124, 128-129 (2) (a) (553 SE2d 662) (2001).

[20] Id. at 130 (2) (c).

[21] See *Christie v. Rainmaster Irrigation, Inc.*, 299 Ga. App. 383, 389 (4) (682 SE2d 687) (2009).

evidence in the record indicating what, if any, services he provided to Action Outdoor with regard to DeKalb III, in which Action Outdoor sold unbuilt billboard permits, leases, and easements. Accordingly, we reverse the trial court's grant of summary judgment to the defendants as to Bedsole's claims for quantum meruit and unjust enrichment with regard to the DeKalb I and II deals, and affirm the grant of summary judgment as to these claims with regard to DeKalb III.

4. *Breach of fiduciary duty and punitive claims*. Finally, Bedsole challenges the trial court's grant of summary judgment to the defendants on his claims for breach of fiduciary duty and punitive damages.

"'It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.'"[22] OCGA § 23-2-58 provides that a fiduciary duty exists "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."

---

[22] *UWork.com, Inc. v. Paragon Technologies, Inc.*, 321 Ga. App. 584, 594 (4) (740 SE2d 887) (2013).

14

The existence of a confidential or fiduciary relationship is a question for the jury. Such relationship may be created by law, contract, or the facts of a particular case. Moreover, because a confidential relationship may be found whenever one party is justified in reposing confidence in another, the existence of this relationship is generally a factual matter for the jury to resolve.[23]

"[A]lthough some confidential relationships are created by law and contract (e.g., partners), others may be created by the facts of the particular case."[24] Thus, "a confidential relationship may exist between businessmen, depending on the facts."[25] An employer-employee relationship

is not the type of relationship such as that of principal and agent from which the law will necessarily imply confidentiality. Generally the relationship between an employer and employee is that of arms length bargaining. This is not to say, however, that under a particular fact situation a confidential relationship can never exist between an employer and his employee.[26]

---

[23] (Punctuation omitted.) *Levine v. Suntrust Robinson Humphrey*, 321 Ga. App. 268, 280 (7) (740 SE2d 672) (2013).

[24] *Cochran v. Murrah*, 235 Ga. 304, 306 (219 SE2d 421) (1975).

[25] Id. at 307.

[26] Id.

15

Here, given the evidence in this case, including the relationship between Bedsole and the defendants, including his equity interest in Action Outdoor, there are genuine questions of fact regarding whether the defendants owed Bedsole a fiduciary duty, whether they breached it, and whether any breach proximately caused him damage.[27] Accordingly, the trial court erred by granting summary judgment to the defendants on Bedsole's claim for breach of fiduciary duty.[28]

*Judgment affirmed in part and reversed in part. Barnes, P.J., and Miller, J., concur.*

---

[27] See *Levine*, 321 Ga. App. at 281 (7) (b); *Cochran*, 235 Ga. at 307.

[28] The defendants argue that they are entitled to summary judgment on Bedsole's claim for punitive damages simply because his claim for breach of fiduciary duty fails as a matter of law, and they make no additional argument on appeal with regard to punitive damages. Therefore, based on our holding that there are genuine issues of fact as to the breach of fiduciary duty claim, we also reverse the grant of summary judgment as to punitive damages, without addressing the issue of whether "the defendant[s'] actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences" as required under OCGA § 51-12-5.1 (b).

16