**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS, P.J., and MILLER, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 19, 2015**

# In the Court of Appeals of Georgia

A14A2246. NETSOFT ASSOCIATES, INC. v. FLAIRSOFT, LTD.

MILLER, Judge.

Netsoft Associates, Inc. brought this action against its business partner Flairsoft, Ltd., alleging, among other claims, that Flairsoft breached a quid pro quo agreement.[1] Flairsoft filed a motion for partial summary judgment, which the trial court granted. Netsoft appeals, contending that the trial court erred in finding that there was insufficient evidence to raise a factual question regarding whether the parties entered into an independent and enforceable quid pro quo agreement. For the reasons that follow, we reverse.

---

[1] Netsoft also brought claims for breach of a promissory note and attorney fees, which are not at issue in this appeal.

On appeal from a grant of summary judgment, we conduct a de novo review of the evidence to determine if there exists a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, entitle the movant to a judgment as a matter of law.

(Citation omitted.) *Capital Color Printing v. Ahern*, 291 Ga. App. 101, 102 (661 SE2d 578) (2008).

So viewed, the evidence shows that prior to 2009, Netsoft was a prime contractor who provided skilled labor to the federal government and other entities at a specified contractual price. Netsoft qualified as a prime contractor based on its certification under the Small Business Administration's 8(a) program ("SBA 8(a)").[2] In July 2009, Netsoft's majority shareholder, who qualified the company for its SBA 8(a) status, suddenly passed away, leaving Netsoft without the ability to continue to obtain prime federal contracts. Accordingly, Netsoft began looking for a qualified SBA 8(a) partner.

In 2009, Netsoft entered into a business relationship with Flairsoft, a qualified SBA 8(a) company. Netsoft agreed to introduce Flairsoft to important government

---

[2] The SBA 8(a) program gives qualified small businesses a competitive advantage in procuring government contracts. See http://www.sba.gov/content/about-8a-business-development-program/.

personnel and key contractors at Robins Air Force Base (AFB), and to assist Flairsoft in obtaining facility and security clearances. In exchange, Netsoft would derive income from any contracts that Flairsoft obtained as a result of introductions made by Netsoft. Thereafter, in October 2009, the parties entered into a Teaming Agreement and an addendum to that agreement (hereinafter the "2009 Teaming Agreement"), under which the parties agreed to share work arising from Netsoft's existing government contract and all subsequent modifications to that contract.

With regard to future contracts, the 2009 Teaming Agreement provided that the parties would join forces to determine the best course of action in the bidding process. The 2009 Teaming Agreement also provided that it was "an ongoing agreement contemplating future contract actions whereby Netsoft and Flairsoft would join forces to bid, win and share in contracts where there [was] a mutually agreed upon course of action." Netsoft, however, conceded at the hearing in this case that the 2009 Teaming Agreement "had met its purpose" and "was completed."

After Netsoft lost its SBA 8(a) status, Netsoft and Flairsoft entered into subcontract agreements whereby Netsoft provided specific employees to fulfill a maximum of 49 percent of Flairsoft's work requirements under its prime contracts

3

with the United States Air Force. Since Flairsoft was the SBA 8(a) prime contractor, it was required to perform at least 51 percent of the work under the prime contracts.

Specifically, in May 2011, Flairsoft entered into a subcontract with Netsoft for the provision of three employees to help fulfill Flairsoft's prime contract at Robins AFB (hereinafter the "First Subcontract"). The First Subcontract was a fixed-price contract which provided for specific hourly labor rates. In April 2012, Flairsoft entered into a second subcontract with Netsoft to provide employees for Flairsoft's prime contract at Wright-Patterson AFB in Ohio (hereinafter the "Second Subcontract"). The Second Subcontract provided for a maximum contract price payable on a monthly basis. Netsoft provided invoices to Flairsoft for work performed on the First and Second Subcontracts, and Flairsoft presented those invoices to the government for payment.

In April 2012, Flairsoft sent Netsoft a second teaming agreement (hereinafter the "2012 Teaming Agreement"). The 2012 Teaming Agreement referenced a plan to award Flairsoft a prime contract for the provision of support services at Wright-Patterson AFB. The 2012 Teaming Agreement also provided that the parties would jointly prepare a proposal for the allocation of work to be performed under the referenced prime contract, and that the proposal would indicate that Netsoft was to

4

be awarded a subcontract by Flairsoft. Netsoft signed the 2012 Teaming Agreement and sent it back to Flairsoft. Although Flairsoft never signed this agreement, the parties operated as though the agreement was duly executed.

Flairsoft fell behind on its invoice payments to Netsoft, and the parties entered into settlement negotiations. Flairsoft signed an unconditional promissory note, a settlement agreement and a release agreement. Netsoft, however, neither agreed to nor signed the settlement agreement. Netsoft instead filed the instant suit.[3] Netsoft subsequently amended its complaint to add a claim for breach of contract based on an alleged quid pro quo agreement. Flairsoft then moved for partial summary judgment on that claim, contending that no such quid pro quo agreement existed. The trial court granted summary judgment to Flairsoft on Netsoft's quid pro quo claim, and this appeal ensued.

In its sole enumeration of error, Netsoft contends that the evidence raised a question of fact regarding whether the parties reached a quid pro quo agreement through their course of conduct. We agree.

---

[3] Flairsoft moved for summary judgment on Netsoft's original complaint and the trial court denied the motion after Netsoft amended its complaint to add the claim for breach of the alleged quid pro quo agreement.

5

Under OCGA § 13-3-1, a valid contract includes three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms. A contract need not be in writing to be valid, but may be enforceable even though it rests only in words as remembered by the witnesses.

(Citations and punctuation omitted.) *Thompson v. Floyd*, 310 Ga. App. 674, 681 (2) (713 SE2d 883) (2011).

To determine whether the parties mutually assented to all essential terms of the contract, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement.

(Punctuation and Footnote omitted.) *Bedsole v. Action Outdoor Advertising JV, LLC*, 325 Ga. App. 194, 198 (1) (750 SE2d 445) (2013). A contract may arise through a course of conduct and mutual acquiescence in such course of conduct may constitute sufficient consideration for that contract. See *Reynolds v. Long*, 115 Ga. App. 182, 184 (154 SE2d 299) (1967).

Here, in response to Flairsoft's motion for partial summary judgment, Netsoft argued, inter alia, that the parties negotiated a quid pro quo agreement which called for continued cooperation between the parties and was independent of the First and Second Subcontracts. Netsoft further argued that Flairsoft acted in conformity with

6

the terms of the quid pro quo agreement, by entering into a number of contracts reflecting the parties' business relationship, and Flairsoft communicated with Netsoft regarding the quid pro quo agreement and the payments to which Netsoft was entitled until Flairsoft became severely delinquent in paying Netsoft's invoices.

In support of its arguments, Netsoft produced emails between the parties and PowerPoint slides which refer to the parties' ongoing partnership and the alleged quid pro quo agreement. Netsoft also submitted a contemporaneous affidavit from one of its officers averring that the parties reached a quid pro quo agreement ensuring that Netsoft would derive income from contracts that Flairsoft obtained as a result of introductions made by Netsoft. In response, Flairsoft submitted an opposing affidavit in which its vice president averred that Flairsoft never agreed to any quid pro quo.

When viewed in the light most favorable to Netsoft as the nonmoving party, the conflicting affidavits and other evidence, including the emails and PowerPoint slides, raise a question of fact for the jury as to whether the parties entered into an independent and enforceable quid pro quo agreement. See *Durham v. Marchman*, 246 Ga. 645, 647 (2) (272 SE2d 343) (1980) (conflicting affidavits presented material issues of fact for determination at trial); *Acworth v. John J. Harte Assoc., Inc.*, 165 Ga. App. 438, 439 (2) (301 SE2d 499) (1983) (conflicting affidavits exemplified

7

existence of material factual issue, rendering grant of summary judgment to appellee inappropriate). Accordingly, we reverse the partial grant of summary judgment to Flairsoft.

*Judgment reversed. Andrews, P. J., and Doyle, P. J., concur*.