**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**February 3, 2026**

# In the Court of Appeals of Georgia

A25A2013. LEGACY FORD OF MCDONOUGH, INC. v. REYNOLDS.

DILLARD, Presiding Judge.

Following trial, a jury found in favor of Michael Reynolds in his breach-of-contract action against Legacy Ford of McDonough, Inc. In bringing his claim, Reynolds alleged that he entered into an agreement with Legacy Ford to trade in a Freightliner tractor-trailer and purchase a Ford F-250 truck. After Reynolds presented his case to the jury, Legacy Ford moved for a directed verdict; but the trial court denied the motion. On appeal, Legacy Ford argues the court erred in doing so because there is no evidence of a written contract between the parties; and even if an oral contract exists, it is unenforceable under the statute of frauds. Legacy Ford also

contends the court erred by affirming the jury's award of attorney fees to Reynolds when there is no evidence it was reasonable. For the following reasons, we reverse.[1]

Viewing the evidence in the light most favorable to the jury's verdict,[2] the record shows that Reynolds worked as a trucker for over 10 years; but in 2014, he opened a furniture business. Reynolds owned a Freightliner as a trucker; but after starting his new business, he quickly discovered it was not "cost effective for [him] to run a tractor-trailer type situation to deliver light furniture." So, after considering his options, Reynolds decided to purchase a pickup truck to operate his new business and sell the tractor-trailer.

To this end, Reynolds went to Legacy Ford to look at pickup trucks, believing he would get the best deal there. In purchasing a truck, Reynolds also wanted to trade in the Freightliner, which he believed would ultimately reduce his tax liability. But the

---

[1] Oral argument was held on September 24, 2025, and is archived on the Court of Appeals of the State of Georgia's website. See Court of Appeals of the State of Georgia, Oral Argument, Case No. A22A1148. (Sept. 24, 2025), available https://vimeo.com/1122946682.

[2] See *Ga Trails & Rentals, Inc. v. Rogers*, 359 Ga. App. 207, 208 (855 SE2d 103) (2021) ("On appeal from a jury verdict, we affirm if any evidence supports the jury's verdict, construing the evidence in the light most favorable to the prevailing party." (quotation marks omitted)).

first time Reynolds visited Legacy Ford, he did not buy a truck because of (what he considered to be) a lowball trade-in offer for his Freightliner. Reynolds then visited several other dealerships seeking a better deal, but those efforts proved to be in vain. He then contacted Legacy Ford and attempted to negotiate a deal with a salesman named Luke. And over the next few weeks, Reynolds and Luke communicated "back and forth" trying to negotiate an agreement as to both Reynolds's trade-in of the Freightliner and purchase of the F-250.

Reynolds then returned to Legacy Ford, and—in continuing to negotiate a deal—he told Luke that the Freightliner had brand new tires. But Luke advised Reynolds that "[t]ires don't matter when you trade-in a car or vehicle . . . ." And at the end of these latest negotiations, Reynolds remained dissatisfied with the trade-in value offered for his Freightliner; so he left the dealership and returned home. At this point, Reynolds concluded that due Legacy Ford's unwillingness to give him a better deal on the Freightliner, he would remove its new tires and swap them with used tires from his brother's tractor-trailer. He then continued his negotiations with Luke; and eventually, Reynolds returned to Legacy Ford to see if an agreement could finally be reached. During this round of discussions, Reynolds told Luke that he had taken the

refrigerator, microwave, and television out of the Freightliner, and replaced the new tires with used ones.

Later that day, Reynolds and Luke agreed on a price for the F-250, which accounted for the trade-in value of the Freightliner. In doing so, the parties signed a "Buyer's Order" for the F-250—with a sales price of $40,498.34 and a trade-in value of $34,000 for the Freightliner. The Buyer's Order also provided that the $27,946.76 balance of the purchase price was to be paid with cash or through financing.

In connection with Reynolds's purchase of the truck, "Ford Credit" generated a document titled "Retail Installment Contract," which noted that there was an "unpaid balance" of $27,835.79 to be paid through financing and included the applicable annual interest rate.[3] This document also provided that, by signing it, Reynolds was agreeing to purchase the vehicle "on credit under the agreements on the front and back of this contract." Additionally, the Retail Installment Contract listed a "total sales price," which was described as "the total cost of [Reynolds's] purchase

---

[3] It is unclear why there is roughly a $100 difference between the amount to be financed in the Buyer's Order ($27,946.76) and the amount to be financed in the Retail Installment Contract ($27,835.79), but that discrepancy is immaterial to the resolution of this appeal.

*on credit*, including [his] down[ ]payment."[4] Lastly, Reynolds signed a Bailment Agreement, which allowed him to take possession of the F-250 temporarily, pending credit approval by a financing company, and provided as follows:

> *Pending credit approval* of Purchaser(s) *by financing institution* and *completion* of the sales transaction, delivery of described vehicle[5] by Dealer is hereby made to Purchaser(s) *as a convenience* to Purchaser(s) and is *subject to all terms and conditions in [the] Sales Order* and the promissory note and security agreement, if any, executed concurrently . . . in accordance therewith [and] said vehicle shall *remain the property of the Dealer.*[6]

Significantly, the Bailment Agreement provided that, if Legacy Ford rescinded the agreement, Reynolds was then required to "promptly return the described vehicle to Dealer [at the] Dealer's address in the same or better condition as when delivered to [him]." The agreement also notified Reynolds that if he failed to do so, Legacy Ford would bring a legal action against him. And while the agreement did not mention

---

[4] (Emphasis added).

[5] The Bailment Agreement did not mention or describe the F-250, the Freightliner, or any other vehicle. But it is undisputed the contract permitted Reynolds to leave the dealership with the F-250.

[6] (Emphasis added).

Reynolds's Freightliner, it is undisputed he left the vehicle at the dealership while the F-250 was in his possession (as dictated by the agreement).

According to Emanuel Jones (the owner of Legacy Ford), a bailment agreement typically allows a customer to take a vehicle being purchased for "a couple of days," but Reynolds left with the F-250 and "hid" it from the dealership for three to four months. Indeed, at some point, Luke contacted Reynolds to re-negotiate his trade-in deal; but believing he already owned the truck, Reynolds declined to do so. So, after Reynolds failed to obtain financing or pay cash for the nearly $28,000 outstanding balance, Legacy Ford repossessed the F-250. Reynolds later testified that he never made a payment on the truck because the dealership failed to send him a "payment book." But according to Jones, Legacy Ford told Reynolds to come take his Freightliner back, and he refused to do so. And because Reynolds quit making payments to the company financing the Freightliner,[7] it was also repossessed. Reynolds testified that he did not want his Freightliner back, he never attempted to get it back from Legacy Ford, and instead, he filed this breach-of-contract action.

---

[7] At some point, the company financing the Freightliner contacted Reynolds about payment on the loan, and he told them that he "traded [it] into [sic] Legacy Ford."

Ultimately, Reynolds claimed that—as a result of his dealings with Legacy Ford—he lost a $34,000 Freightliner and had to close his furniture business.

Reynolds sued Legacy Ford for "breach of contract and bad faith."[8] More precisely, Reynolds claimed that Legacy Ford breached the contract for his purchase of the F-250 and acted in bad faith by (1) failing to pay off the existing loan on the Freightliner, which caused it to be repossessed; (2) failing to submit executed financing documents to Ford Acceptance Corporation (*i.e.*, Ford Credit); (3) failing to deliver the documents transferring the titles of both the Freightliner and the F-250 to the State of Georgia, as required by the agreement; and (4) falsely "swearing out a criminal warrant," alleging that he committed theft by taking. The case eventually proceeded to trial, during which the above evidence was presented. And after the close of Reynolds's case, Legacy Ford moved for a directed verdict. In support of that motion, Legacy Ford argued there was no evidence that it reached an agreement with Reynolds finalizing the sale of the F-250. Specifically, Legacy Ford maintained there were no signed documents between the parties; and regardless, any deal for the sale

---

[8] Reynolds also brought a conversion claim against Legacy Ford, but the trial court granted a directed verdict to the dealership on that claim, and it is not at issue on appeal.

of the F-250 was contingent on Reynolds obtaining financing (which he never did). Finally, Legacy Ford argued that—without a written contract signed by both parties—Reynolds's breach-of-contract claim was barred by the statute of frauds.

Reynolds disagreed, arguing that there was a valid contract between the parties, there was an offer and acceptance under its terms; and although the purchase was to be financed by Ford Credit, he claimed the dealership never submitted the financing documents for approval. Reynolds also claimed that, in failing to submit those documents, Legacy Ford acted in bad faith. Following additional arguments by the parties, the trial court denied Legacy Ford's motion for a directed verdict, noting it would "leave it up to the jury . . . to decide whether . . . there was an actual contract . . . ." Ultimately, the jury found in Reynolds's favor, awarding him $74,000 in damages and $20,000 in attorney fees. The court then entered a judgment on that verdict. This appeal follows.

When a jury returns a verdict, it will be affirmed on appeal if there is any evidence to support it, and this evidence is "to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the

verdict."[9] Put another way, a jury verdict, "after approval by the trial court . . . will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[10] With this deferential standard of review in mind, we turn now to Legacy Ford's claims of error.

1. Legacy Ford first argues the trial court erred in denying its motion for a directed verdict because there is no evidence a contract existed between it and Reynolds for the purchase of a F-250. We agree.

A trial court may only direct a verdict in a party's favor if "there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict."[11] Indeed, if there is *any* evidence—even slight evidence—to "support the opposing party's case,

---

[9] *Yash Sols., LLC v. New York Glob. Consultants Corp.*, 352 Ga. App. 127, 132(1) (834 SE2d 126) (2019) (quotation marks omitted). Accord *Green v. Key Custom Homes, Inc.*, 302 Ga. App. 800, 802(1) (692 SE2d 56) (2010).

[10] *Yash Sols.*, 352 Ga. App. at 132(1) (punctuation omitted). Accord *Green*, 302 Ga. App. at 802–03 (1).

[11] *Reeves v. Allstate Ins. Co.*, 371 Ga. App. 474, 474 (901 SE2d 223) (2024) (quotation marks omitted).

granting a directed verdict is improper."[12] Finally, this Court reviews the grant of a

motion for directed verdict *de novo*, and we "must construe the evidence in favor of

the nonmovant."[13]

As to a breach-of-contract claim, the party asserting the existence of a contract

has "the burden of proving its existence and its terms."[14] In order to constitute a valid

contract, there must be "parties able to contract, a consideration moving to the

contract, the assent of the parties to the terms of the contract, and a subject matter

upon which the contract can operate."[15] And relevant here, Georgia contract law

---

[12] *Id.* (quotation marks omitted). Accord *Miller v. Lynch*, 351 Ga. App. 361, 362 (830 SE2d 749) (2019).

[13] *Reeves*, 371 Ga. App. at 474.

[14] *Toll Bros., Inc. v. Larkabit P'ship, L. P.*, 375 Ga. App. 567, 571(1) (916 SE2d 785) (2025) (quotation marks omitted). Accord *Barnes v. Martin-Price*, 353 Ga. App. 621, 624(1) (838 SE2d 916) (2020).

[15] *Hunter v. Lowndes County Health Servs., LLC*, 355 Ga. App. 367, 369(1) (844 SE2d 261) (2020) (quotation marks omitted). Accord *Hunt v. Thomas*, 296 Ga. App. 505, 509(2) (675 SE2d 256) (2009). As to the requirements for a valid contract to exist, Legacy Ford argues only that there was no mutual assent or meeting of the minds between the parties as to the terms of the purported contract. As a result, it has abandoned any argument that one or more of the other requirements were not satisfied. See *Reece v. State*, 210 Ga. 578, 579(4) (82 SE2d 10) (1954) (holding that grounds for appeal that were not raised in the briefs nor otherwise argued during appeal proceedings were abandoned).

requires "a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid[,] the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon."[16] And to determine whether the parties mutually assented to all essential terms of a contract, the "circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement."[17] So, in deciding whether there was mutual assent, Georgia courts are "free to consider such extrinsic evidence."[18] Also, when extrinsic evidence exists and is disputed, the question of

---

[16] *Bedsole v. Action Outdoor Advert. JV, LLC*, 325 Ga. App. 194, 198(1) (750 SE2d 445) (2013) (quotation marks omitted). See *Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 661 (164 SE2d 229) (1968) ("The *first* requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality . . . ." (emphasis added)); *Sidhom v. Boutros*, 358 Ga. App. 432, 434–35 (855 SE2d 426) (2021) ("A valid contract requires mutual assent, and if such assent is lacking, the contract is not enforceable.").

[17] *Bedsole*, 325 Ga. App. at 198(1) (quotation marks omitted). Accord *Frickey v. Jones*, 280 Ga. 573, 575 (630 SE2d 374) (2006). See *Sidhom*, 358 Ga. App. at 435 (explaining that "[i]n determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable [person] in the position of the other contracting party would ascribe to the first party's manifestations of assent." (quotation marks omitted)).

[18] *Sidhom*, 358 Ga. App. at 435 (quotation marks omitted). Accord *Frickey*, 280 Ga. at 575 . See *BellSouth Advert. & Pub. Corp. v. McCollum*, 209 Ga. App. 441, 444(2)

"whether a party has assented to the contract is generally a matter for the jury."[19]

Even so, we have held that, in general, contract disputes are "particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court."[20]

Here, after Reynolds rested his case, Legacy Ford moved for a directed verdict, arguing that (1) he failed to present evidence that an agreement between the parties existed, (2) regardless, any final sale was contingent on Reynolds obtaining financing for a substantial portion of the purchase price, and (3) he did not obtain financing *or* offer to pay cash for the outstanding balance. In response, Reynolds claims there was

---

(433 SE2d 437) (1993) ("Although parol evidence cannot be used to contradict or vary the terms of a valid written agreement, parol evidence may be used to show no valid agreement ever went into existence.").

[19] *Bedsole*, 325 Ga. App. at 198(1) (quotation marks omitted). Accord *Moreno v. Smith*, 299 Ga. 443, 445(1) (788 SE2d 349) (2016).

[20] *Toll Bros.*, 375 Ga. App. at 571(1) (quotation marks omitted). Accord *Stankovich v. Axis Ins. Co.*, 365 Ga. App. 877, 877 (880 SE2d 366) (2022). Although the jury was allowed to determine whether the parties mutually assented to all material terms of a contract, in denying Legacy Ford's motion for a directed verdict, the trial court decided to "leave it up to the jury . . . to decide whether . . . there was an actual contract or not . . . ." And while we find this assertion by the court troubling, our reversal of its denial of a directed verdict to Legacy Ford means we need not discuss that comment any further.

ample evidence that he and Legacy Ford executed a contract for the dealership to sell him the F-250 for "a certain amount determined by an agreed-to price that accounted for the trade-in value of the Freightliner."

In doing so, Reynolds directs us to the Buyer's Order, which he contends is a valid contract for the sale of the F-250—as it detailed the financial terms of the sale and was signed by both parties. But setting aside whether the Buyer's *Order* is a valid *contract* (which is doubtful), the order provided that $27,946.79 of the agreed-on price was the "Balance of the Cash Price or Amount to Finance." And again, Reynolds presented no evidence that he obtained financing or paid cash for even a portion of that amount.[21] In fact, Reynolds testified that he never made a single payment for the F-250 to any finance company; and he did not believe the sales contract for the truck was contingent on credit approval. But significantly, there is nothing in the Buyer's

---

[21] Reynolds testified that he could have paid cash for the balance of the purchase price, but he never offered to do so. And while Reynolds complains that Legacy Ford never turned in his application for financing to Ford Credit, he cites no evidence that any contract required the dealership to do so. In contrast, at trial, Reynolds testified that he *did* obtain financing from Ford Credit before he left with the F-250, even though he never made a payment to Ford Credit or any other financing company. Legacy Ford's fixed-operations manager testified that Reynolds's original pre-application was "submitted to the bank[,] but it was contingent based on the terms of the deal." And the manager also testified that the deal with Reynolds fell through because he sabotaged it by changing the Freightliner's tires.

Order suggesting the sale was final regardless of whether Reynolds obtained financing or paid cash for the agreed-on price of the truck. Tellingly, Reynolds never explains why he believed he owned the F-250 when he left the dealership without paying the nearly $28,000 outstanding balance on it. So, despite agreeing to the Buyer's Order, Reynolds appears to believe he was not required to pay the agreed-on price for the truck.

Although Reynolds emphasizes that Legacy Ford representatives testified they reached a "deal" with him, there is no evidence that the terms of any deal were final *without Reynolds paying $27,946.79 in cash or obtaining financing* for that amount. And while Reynolds references Jones's testimony that the Buyer's Order was "a signed agreement to sell the car," Jones also explained the order is "akin to the buying conditions of the [sale] . . . ," *including the amount the buyer must finance or pay in cash.* So, even if the Buyer's Order constituted a written contract, Reynolds admittedly failed to satisfy the financial requirements for buying the F-250, while insisting he still owned the truck without doing so.

Reynolds also points to Jones's testimony that the "Retail Installment Contract" he and Legacy Ford signed constituted a "summary contract" that is used

only when deals are financed. And while it is unclear whether Legacy Ford actually signed this purported contract,[22] that document provided that Reynolds could purchase the vehicle "for cash *or* credit," but he was "*choos[ing]* to buy the vehicle *on credit* under the agreements on the front and back of this contract."[23] This alleged contract also provided a "total sales price," which was described as "the total cost of [Reynolds's] purchase *on credit*, including [his] down[ ]payment."[24] So, as with the

---

[22] Instead of a Legacy Ford representative signing the Retail Installment Contract on behalf of the dealership, "Legacy Ford, Inc." was stamped in print across the line designated for the seller's signature. It is unclear whether Legacy Ford used the stamp *as* an electronic signature, but the entire line for the seller's signature states "*Legacy Ford, Inc. By X* [,]" which suggests that a Legacy Ford representative is required to sign on behalf of the dealership on the line following "By X." (emphasis added). But as explained below, even if "Legacy Ford, Inc." stamped in print is a valid electronic signature, the Retail Installment Contract did not relieve Reynolds of paying the agreed-on price for the F-250 to complete the sale and become its owner. See *Buffa v. Yellowbook Sales & Distrib. Co.*, 327 Ga. App. 639, 641 (760 SE2d 644) (2014) ("Generally, a corporation's officers and the corporation are entirely separate and distinct entities[,] [and] [c]ontracts may be signed by one acting in a representative capacity . . . ." (quotation marks omitted)). But see *Morgan & Morgan Atlanta, PLLC v. Brown,* 373 Ga. App. 459, 465(1)(a) (908 SE2d 727) (2024) ("If a law requires a signature, an electronic signature shall satisfy the law, and a record or signature shall not be denied legal effect or enforceability solely because it is in electronic form." (quotation marks omitted)).

[23] (Emphasis added).

[24] (Emphasis added).

Buyer's Order, the Retail Installment Contract reflected an agreement that Reynolds was required to obtain financing for a large portion of the purchase price.[25] In any event, despite Reynolds's claim that he owned the F-250 when he left the dealership, he signed a bailment agreement providing that Legacy Ford still owned the truck pending financing, and noting that he was required to promptly return the vehicle if the dealership rescinded the agreement.

In sum, the circumstances surrounding Reynolds's alleged purchase of the F-250, the discussions between the parties, and the documents described above establish that the parties did not mutually assent or have a meeting of the minds as to (1) who owned the F-250 and Freightliner at the time Reynolds signed the Bailment Agreement, and (2) whether the sale of the F-250 was contingent on Reynolds obtaining financing for a significant portion of the purchase price. And importantly, in determining whether there was mutual assent,

> courts apply an objective theory of intent whereby one party's intention
> is deemed to be that meaning a *reasonable man in the position of the other*

---

[25] In arguing that a valid contract for the sale of the F-250 existed, Reynolds also references a form titled AXZD-Plans Pricing Agreement, but he acknowledges (and the appellate record confirms) that neither Legacy Ford nor one of its representatives signed it.

*contracting party* would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.[26]

And here, given the terms of the bailment agreement, it was more than reasonable for Legacy Ford to believe it owned the F-250 until Reynolds paid the *agreed-on* purchase price for the truck in cash or through financing. As a result, the trial court erred in denying Legacy Ford's motion for a directed verdict.[27]

---

[26] *Bedsole*, 325 Ga. App. 194, 198(1) (quotation marks omitted) (emphasis added). Accord *Frickey*, 280 Ga. at 575; *Turner Broad. Sys., Inc. v. McDavid*, 303 Ga. App. 593, 597(1) (693 SE2d 873) (2010).

[27] See *Yim v. Carr*, 349 Ga. App. 892, 905–06(2) (827 SE2d 685) (2019) (holding there was no meeting of the minds and no binding settlement agreement between an insurance company and an insured individual when the insured reasonably believed that the agreement only released one defendant from liability for bodily-injury claims and the insurance company believed that the settlement agreement released all of the insured defendants); *Penn v. Muktar*, 309 Ga. App. 849, 850–51 (711 SE2d 337) (2011) (holding there was no meeting of the minds regarding a settlement agreement when plaintiffs offered to settle bodily-injury claims for an insurance policy's bodily-injury policy limits, but the insurance company agreed to pay the $50,000 bodily-injury limit to settle and release it from the bodily-injury claims, *the property damage claims and any other claims resulting from the collision at issue*); *Anderson v. Benton*, 295 Ga. App. 851, 855(1) (673 SE2d 338) (2009) (holding that a binding settlement never formed, where demand letter expressly limited which claims and parties the plaintiff intended to release as part of the settlement offer, but insurer required a broader release).

2. Next, Legacy Ford argues the trial court erred in denying its motion for a directed verdict because any oral contract that existed violated the statute of frauds. Yet again, we agree.

Under the statute of frauds, the sale of goods for $500.00 or more is not enforceable by way of action or defense "unless there is a record sufficient to indicate that a contract for sale has been made between the parties and *signed* by the party against whom enforcement is sought or by the party's authorized agent or broker."[28] In other words, a contract for the sale of goods for $500.00 or more is "not enforceable by way of action or defense unless there is some *writing* sufficient to indicate that a contract for sale has been made between the parties and *signed by the party against whom enforcement is sought* or by his authorized agent or broker."[29] But notwithstanding the writing and signature requirements of the statute of frauds, a contract for the sale of goods is "still enforceable if the party against whom

---

[28] OCGA § 11-2-201(1). See *Isbell v. Credit Nation Lending Serv., LLC*, 319 Ga. App. 19, 28(3)(b) (735 SE2d 46) (2012) (referring to OCGA § 11-2-201 as the statute of frauds).

[29] *Isbell*, 319 Ga. App. at 28(3)(b) (quotation marks omitted) (emphasis added). Accord *Brooks Peanut Co. v. Great S. Peanut, LLC*, 322 Ga. App. 801, 804 (746 SE2d 272) (2013).

enforcement is sought *admits* in his pleading, testimony, or otherwise in court that a contract for sale was made."[30]

Here, Reynolds agreed to a purchase price for the F-250 that was significantly more than $500. As a result, any contract for the sale of the truck was required to be in writing and signed by Legacy Ford—*i.e.*, the party against whom enforcement is sought. And as explained in Division 1, no *written*, enforceable contract exists. Indeed, Legacy Ford maintains it never finalized an agreement with Reynolds, oral or otherwise, for the sale of the F-250. Thus, the exception to the writing requirement in the statute of frauds does not apply because Legacy Ford never admitted—in a pleading, through testimony, or otherwise—that a final, binding contract for the sale

---

[30] *Isbell*, 319 Ga. App. at 28(3)(b) (quotation marks omitted) (emphasis added). See OCGA § 11-2-201(b)(3) ("A contract which does not satisfy the requirements of subsection (1) of this Code section but which is valid in other respects is enforceable ... [i]f the party against whom enforcement is sought admits in his or her pleading, testimony, or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted."). See also *Jackson v. Meadows*, 153 Ga. App. 1, 2(3) (264 SE2d 503) (1980) (holding that "a contract which is otherwise insufficient may still be enforceable if the party against whom enforcement is sought admits by pleading or testimony that a contract of sale was in fact made.").

of the truck to Reynolds ever existed.[31] And under these circumstances, the trial court erred in rejecting Legacy Ford's argument that any oral agreement between Reynolds and the dealership was unenforceable under the statute of frauds.[32]

3. Finally, Legacy Ford contends the trial court erred in allowing the jury to award Reynolds attorney fees because there is no evidence as to the reasonableness of the fees awarded. Once again, we agree.

---

[31] See *Godwin v. Westberry*, 231 Ga. 492, 493 (202 SE2d 402) (1973) (holding that oral contract was unenforceable under the statute of frauds when, among other things, the party against whom enforcement was sought did not admit in his pleading, testimony, or otherwise in court that a contract between the parties was made). Cf. *Jones v. Baran Co., LLC*, 290 Ga. App. 578, 583–34(1) (660 SE2d 420) (2008) (holding that oral agreement did not violate the statute of frauds when the defendant admitted in its answer to the complaint that it entered into a contract with the plaintiff); *Henry v. Blankenship*, 284 Ga. App. 578, 581(2) (644 SE2d 419) (2007) (holding that oral contract was enforceable under the statute of frauds when the party defending against a breach-of-contract claim admitted during his trial testimony that a contract existed).

[32] See *supra* note 31. Legacy Ford has not appealed the jury's verdict finding that it acted in bad faith; but because it did not breach any contract with Reynolds, the dealership could not have done so in bad faith. See *Popham v. Landmark Am. Ins. Co.*, 340 Ga. App. 603, 611–12(4) (798 SE2d 257) (2017) (holding that because the plaintiffs did not establish the existence of "a contract of insurance" in effect at the time of an accident, no bad faith claim can be asserted against either insurance company defendant for failure to pay a claim arising from that accident).

An award of attorney fees is, of course, "derivative of a plaintiff's substantive claims."[33] Reynolds can only prevail on his claim for attorney fees, then, if he succeeded on "an underlying substantive claim."[34]And here, Reynolds is not entitled to an award of attorney fees because he has not prevailed on his breach-of-contract claim. As a result, we also reverse the jury's award of attorney fees to Reynolds.[35]

For all these reasons, we reverse the trial court's denial of Legacy's motion for a directed verdict.

*Judgment reversed. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

[33] *Stephen A. Wheat Tr. v. Sparks*, 325 Ga. App. 673, 682(7) (754 SE2d 640) (2014). Accord *Hobbs through Eagle v. Integrated Fire Prot., Inc.*, 357 Ga. App. 790, 802(4) (850 SE2d 256) (2020).

[34] *Hobbs through Eagle*, 357 Ga. App. at 802(4) (quotation marks omitted). See *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 146(2) (475 SE2d 601) (1996) ("A prerequisite to any award of attorney fees . . . is the award of damages or other relief on the underlying claim.").

[35] See *Popham*, 340 Ga. App. at 612(4) (holding that the appellant could not recover attorney fees when his underlying substantive claims failed as a matter of law); *Stephen A. Wheat Tr.*, 325 Ga. App. at 682(7) (holding that because the trial court erred in granting summary judgment to the appellants as to their substantive fraud claim, it likewise erred in granting summary judgment on their claim for attorney fees).