**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 15, 2015**

# In the Court of Appeals of Georgia

A15A0116.  ETOWAH  ENVIRONMENTAL  GROUP,  LLC  v. WALSH et al.

BRANCH, Judge.

In August 2006, defendant Highstar Capital Fund II, LP ("Highstar") acquired Advanced Disposal Services, Inc. ("ADS") for $470 million. In a lawsuit later filed against ADS, plaintiff Etowah Environmental Group, LLC ("Etowah") claimed that ADS had presented Etowah with an artificially low price for Federal Road, a Forsyth County waste management facility owned by ADS and Etowah, and that ADS had thus induced Etowah to forego its right to "tag along" in Highstar's acquisition of ADS. An arbitration panel later found that ADS had breached its fiduciary duty to Etowah in the context of the ADS acquisition and awarded Etowah approximately $19 million for the value of Federal Road.

In February 2012, after collecting the arbitration award, Etowah brought this action for fraud and other claims, and seeking punitive damages and attorney fees, against Highstar and its principals Michael Walsh and Christopher Beall, as well as Highstar's subsidiary Adstar Waste Holdings Corporation ("the Highstar defendants"). The Highstar defendants moved for summary judgment on the ground that the issue of the value of Federal Road had already been determined by the arbitration panel such that Etowah was collaterally estopped from raising that issue in its action against the Highstar defendants. On appeal from the trial court's grant of the Highstar defendants' motion, Etowah argues that the issue of the value of its share of Federal Road is not precluded. Etowah also argues that the trial court erred when it granted summary judgment as to Etowah's claims for other compensatory and punitive damages against Highstar and when it excluded documents produced by Highstar's consultants as privileged. We conclude that although the trial court did not err when it barred Etowah from relitigating that portion of its fraud claim that would have involved the issue of Federal Road's value and when it excluded the documents, genuine issues of fact remain as to Etowah's claim for attorney fees and costs incurred before the arbitration panel in discovering the extent of Highstar's fraud, and

2

thus as to punitive damages arising from that claim. We therefore affirm in part and reverse in part.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.

*Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

Thus viewed in favor of Etowah, the record shows that in 2001, Etowah and Advanced Disposal Services, Inc. ("ADS") agreed to form Federal Road, LLC, which

3

would acquire and operate the Eagle Point landfill in Forsyth County.[1] ADS held a

75% interest in Federal Road, with Etowah owning the remaining 25%. Section 10.6

of Federal Road's operating agreement provided for Etowah's "tag-along right" as

follows:

> (a) In the event a Member elects to transfer . . . all or a portion of its
> [Federal Road] Interest (the "Selling Member") to an unaffiliated third
> party . . . , all remaining Members ("Non-Selling Members") shall have
> the right to cause the Selling Member to effect the transfer of such Non-
> Selling Members' respective [Federal Road] Interest to such Third Party
> at an incremental price and on the same terms and conditions ("the

---

[1] Rather than citing to evidence as it may appear in an admittedly "unwieldy" 78-volume record of more than 13,000 pages (not including voluminous deposition transcripts), Etowah cites only its own statement of material facts filed below as to some of the events at issue. See Court of Appeals Rule 25 (a) (1) ("Record and transcript citations shall be to the volume or part of the record or transcript and the page numbers that appear on the appellate record or transcript as sent from the trial court"), (c) (2) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of such reference, the Court will not search for or consider such enumeration."). We also remind Etowah that "[c]ontentions as to undisputed material facts under [Uniform Superior Court] Rule 6.5 . . . are not evidence for purposes of summary judgment, nor does any lack of response to such contentions amount to an admission of fact." *Southern Gen. Ins. Co. v. Davis*, 205 Ga. App. 274, 275 (421 SE2d 780) (1992) (citation omitted); see also *Cincinnati Ins. Co. v. Perimeter Tractor & Trailer Repair, Inc.*, 192 Ga. App. 243, 244 (1) (384 SE2d 449) (1989). We have accepted Etowah's account of these matters only because Highstar has not controverted that account. See Court of Appeals Rule 25 (b) (1) ("Except as controverted, appellant's statement of facts may be accepted by this Court as true.")

4

Offer") as the Selling Members proposes to transfer its [Federal Road] Interest to such Third Party (the "Tag-Along Right").

Section 10.10 of the operating agreement, entitled "Consent to Merger," provided in relevant part:

> *[E]ach Member hereby irrevocably consents to the merger or consolidation by any legal means of [Federal Road] with [ADS]* (or its successor) upon (i) the election of [ADS] (or its successor); and (ii) the adoption of a plan of merger or other consolidation by Majority Vote which provides Units of relatively equal value in [ADS] or successor entity in exchange for the [Federal Road] Interest held by each Member.

Section 10.10 also provided that the "unit value" to be used in calculating each Federal Road member's interest "shall be made in accordance with paragraph 10.9 (b)," which provided in relevant part that

> [t]he Unit Value of Units issued by [Federal Road] and the Unit Value of Units issued by [ADS] shall be determined to arrive at the ratio of units in [ADS] exchanged for Units in [Federal Road] pursuant to a Unit Exchange. The Unit Value . . . shall be determined: (i) by agreement by and between each Member of [Federal Road] and [ADS], or (ii) . . . by *an appraiser[, who] shall determine that total fair market value of [Federal Road] and divide that amount by the total Units outstanding and after considering voting rights and applicable discounts and*

*premiums, arrive at the Unit Value of the Units issued by [Federal Road] to such Member to be exchanged for Units in [ADS].*

On May 5, 2006, Highstar sent ADS's principal, Charles Appleby, a written offer to buy ADS for $425 million "less the balance of [ADS's] existing debt," with Federal Road accounting for at least $62 million of ADS's value. On May 10, Highstar increased its offer for ADS by $25 million, to $450 million, but decreased the value of Federal Road to between $45.5 million and $47 million. On May 19, Highstar increased its written offer for ADS by another $20 million, to $470 million, but also created a second offer letter, addressed to ADS, that purported to be an offer for Federal Road alone at a price of $45.5 million. According to Etowah, Highstar created the second May 19 letter for the purpose of deceiving Etowah as to the terms of Highstar's offer for ADS, including the value of Federal Road.

On June 12, 2006, Highstar and ADS met in New York to discuss Highstar's offer. On the following day, ADS met with Etowah and showed its representatives Highstar's second offer letter (but not its first) as well as an analysis showing how much Etowah would receive were it to "tag along" to the $45.5 million offer for Federal Road. As a result of being shown this letter, and because it felt that the $45.5 million offer for Federal Road was too low, Etowah declined to exercise its tag-along

6

right. A merger plan dated June 30, 2006, provided that Etowah would merge into ADS, with Etowah's 25% interest in Federal Road to be exchanged for ADS shares.

In August 2006, Highstar acquired ADS for $470 million. On September 21, 2006, Etowah was merged into ADS in accordance with Delaware law. On May 19, 2007, ADS merged Etowah out of its minority ownership of ADS shares. On June 1, 2007, Etowah sued ADS and others, but apparently not the Highstar defendants,[2] in Forsyth County Superior Court for fraud, breach of contract, and other claims arising from Highstar's acquisition of ADS. On September 26, 2007, Etowah also filed a petition for appraisal in Delaware's Court of Chancery seeking "a determination of the fair value of its shares of ADS common stock." In March 2009, this Court affirmed the trial court's grant of ADS's motion to compel arbitration in the Forsyth County lawsuit according to the operating agreement's arbitration clause. *Etowah Environmental Group v. Advanced Disposal Svcs.*, 297 Ga. App. 126, 130-131 (1) (676 SE2d 456) (2009). The Forsyth County and Delaware actions were then consolidated in arbitration.

---

[2] Etowah has not explained why Highstar was not named as a defendant in its lawsuit against ADS, which had apparently become a wholly owned subsidiary of Highstar at the time Etowah filed its first action. Nor can we determine the identity of all the defendants to Etowah's first complaint because Etowah has failed to provide a citation to that complaint as it appears in the appellate record.

Etowah's arbitration demand alleged that ADS had breached the operating agreement by "fail[ing] to disclose" its discussions with Highstar as part of a "scheme" to acquire Etowah's interest in Federal Road for less than its fair value; by merging Federal Road into ADS; and by "forcing" ADS into a "tainted" appraisal process. Etowah also alleged that as a result of this "scheme," ADS "obtained cash for the entire value of Federal Road, rather than just 75% of it, and then promised Etowah ADS stock, and not cash, resulting in a windfall to ADS," which received the value of Etowah's share in cash at the time of the acquisition. The parties soon stipulated, however, that the panel would determine "*the value* as of [August or September] 2006 . . . *of Etowah's 25 percent interest in Federal Road.*" (Emphasis supplied.)

On the issue of the "value" of Etowah's 25% interest in Federal Road, ADS contended to the arbitration panel that Sections 10.9 and 10.10 of the operating agreement provided it with the right to merge Federal Road into ADS and to convert Etowah's shares of Federal Road into shares of ADS. ADS also asserted that the arbitration panel was required to accept an appraisal, prepared by Houlihan Lokey, opining that Etowah's share of Federal Road was worth less than $8.6 million. By contrast, Etowah argued that ADS had breached a fiduciary duty when it failed to

negotiate in good faith with Etowah in the Highstar transaction. In its closing argument to the arbitration panel, for example, Etowah contended that it should have been informed of ADS's first May 5, 2006 letter to Highstar, which valued Federal Road at $62 million or more, and that the arbitrators should increase the lost tag-along value of Federal Road to 25% of $72 million, or $18 million.

On July 1, 2010, the arbitrators awarded Etowah over $19 million "as the value for Etowah's interest in Federal Road."[3] The panel accepted Etowah's argument that ADS had breached its fiduciary duty to ensure that the Highstar transaction was "fair to Etowah as to the details of the transaction and the price to be paid to Etowah for its minority interest in Federal Road." The panel also rejected ADS's argument that under Section 10.9 (b) of the operating agreement, Etowah was bound by the Houlihan Lokey appraisal. Rather, the panel concluded that under Delaware law, which enables courts to make a minority shareholder whole after a breach of fiduciary duty, an "entire fairness" standard applied, under which Etowah, as a "beneficial owner of ADS shares," was entitled to a "proportionate share" of ADS. The panel

_____

[3] The arbitrators reached this figure by multiplying Federal Road's estimated income over the 12 months preceding the merger "by a factor of 9.8," for a valuation of more than $81 million, minus a deduction for debt, for a total "one-quarter interest in the value of Federal Road" of $19,174,545.

rejected Etowah's claim under OCGA § 13-6-11 for attorney fees and costs, however, due to its "concern" as to "Etowah's delay in attempting to circumvent arbitration" as well as the difficulty of distinguishing between Etowah's bad-faith and other claims against the ADS defendants, which the panel found "impossible [to do] in this case." But the panel also awarded Etowah prejudgment interest, nominal damages, $3.9 million in punitive damages against ADS, and $250,000 in punitive damages against Appleby, for a total award, after set-off, of $26.4 million. Etowah collected the award and filed a notice of satisfaction with the panel.

In February 2012, however, Etowah brought the instant action against the Highstar defendants, alleging that they had participated in the scheme with ADS and Appleby to obtain Etowah's interest in Federal Road for less than its "true value." This second action included a claim that Highstar's principals had intentionally misrepresented Federal Road's value and that Etowah had reasonably relied on these misrepresentations to its detriment. In August 2012, the trial court denied Highstar's first motion for summary judgment on the ground that in light of the "limited record" before it, the question whether Etowah was estopped from asserting the issue of Federal Road's value did not yet have a definitive answer.

10

In the course of discovery in its action against the Highstar defendants, Etowah produced the testimony of an appraiser, Christopher Mercer, to the effect that because Highstar's offer to ADS had combined the values of ADS and Federal Road into one price, a determination of Federal Road's value in the Highstar transaction required an "allocation of value based on economic contribution." In December 2013, Highstar filed a second motion for summary judgment on grounds including that the issue of the value of Federal Road had been conclusively determined in the arbitration such that Etowah was precluded from raising the issue in its second action. After a hearing, the trial court granted the motion on the ground that the issue of Etowah's "interest" in Federal Road had been "litigated and determined in the arbitration proceeding." The court specifically rejected Etowah's attempt, via Mercer, to "concoct another valuation opinion" by "reverse-engineer[ing] a methodology strikingly similar to that performed by the panel" in order to reach "a value [Mercer] opines should be afforded to Federal Road based on the ADS purchase price." The trial court also accepted the panel's finding that fees and expenses were "impossible" to calculate in the case. This appeal followed.

1. In two related assertions of error, Etowah argues that the trial court erred when it concluded that Etowah was precluded from re-litigating the issue of the

11

"actual value" of its interest in Federal Road as a part of its new fraud claim against the Highstar defendants.

As a preliminary matter, we note that these assertions of error raise a question of collateral estoppel, or issue preclusion, and not one of res judicata, or claim preclusion. "The doctrine of res judicata prevents the re-litigation of all *claims* which have already been adjudicated, or which could have been adjudicated, between identical parties or their privies in identical causes of action." *Body of Christ Overcoming Church of God v. Brinson*, 287 Ga. 485, 486 (696 SE2d 667) (2010) (citation and punctuation omitted; emphasis supplied). By contrast,

> the related doctrine of collateral estoppel precludes the re-adjudication of an *issue* that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, *unlike res judicata, collateral estoppel does not require identity of the claim* – so long as the *issue* was determined in the previous action and there is identity of the parties, *that issue may not be re-litigated, even as part of a different claim*.

Id. (citation and punctuation omitted; emphasis supplied). Under Georgia law, the doctrines of claim and issue preclusion apply to arbitration proceedings. *Bennett v. Cotton*, 244 Ga. App. 784, 785 (1) (536 SE2d 802) (2000). A party may therefore be

12

precluded from raising a claim or an issue previously arbitrated "even if some new factual allegations have been made, some new relief has been requested, or a new defendant has been added." Id. (citation and punctuation omitted). To prevail on a collateral estoppel claim, however, a party "must prove that the contested issues, even though arising out of a different claim, were actually litigated and decided and were necessary to the prior decision." *Boozer v. Higdon*, 252 Ga. 276, 278 (1) (313 SE2d 100) (1984) (citations omitted).

Although Etowah asserted a lack of identity between the defendants to its ADS and Highstar actions as a bar to Highstar's defense of collateral estoppel, the trial court held that as co-conspirators against Etowah, ADS and the Highstar defendants were in privity with each other such that Highstar could assert issue preclusion against Etowah as to the value of its Federal Road shares. Etowah has not challenged this part of the trial court's ruling on appeal, and we pass no judgment on it here. Rather, Etowah insists that the issue of the "actual purchase price" Etowah should have been offered and should now receive for its share of Federal Road has never been litigated, even if the issue of Federal Road's "fair market value" was decided by the arbitration panel. We disagree.

13

No "actual purchase price" can be said to exist for Etowah's share of Federal Road because Highstar purchased ADS and Federal Road by means of a single offer, which did not allocate the value of Federal Road within that offer.[4] Further, Etowah has always sought to recover the value of its property interest in Federal Road, first lost when Etowah was fraudulently induced to surrender its tag-along rights under Section 10.6 of the operating agreement, and not recouped when it failed to receive an appropriate appraisal for the value of its Federal Road shares. In other words, as the arbitration panel noted at the outset of its ruling, the issue before it was "the value of Etowah's minority interest in Federal Road as a result of a merger of Federal Road into ADS . . . and to decide various tort claims asserted by Etowah against ADS and Mr. Appleby." By necessity, then, the arbitrators were charged by both parties with deciding the issue of Federal Road's "value" in the specific factual context of the Highstar acquisition of ADS, including both Etowah's tortiously induced decision to decline its tag-along right (the subject of the Forsyth County lawsuit against ADS) and its remedy of an appraisal of the value of the ADS shares Etowah should have

---

[4] We can imagine that had Highstar actually purchased Federal Road separately, or purchased ADS with a specific amount allocated to Federal Road, Etowah could conceivably raise the issue of the "actual purchase price" it should have received for its Federal Road shares. This is not the case before us, however.

acquired (the subject of the Delaware action). Whatever evidence may have gone into the calculation of that value, the fact remains that the arbitrators were required, in the end, to determine a specific but hypothetical "value" in compensation for the economic loss Etowah sustained as a result of the *undervaluation* of its Federal Road shares. As Etowah itself characterized the matter in its post-hearing brief to the arbitration panel: "This dispute is over what proportional value Etowah should be tagging along at."

In its efforts to overcome its own characterization of the matter, Etowah first points to the expert Christopher Mercer, who testified that the issue of Etowah's recovery for the value of Federal Road required an "relative allocation of value based on economic contribution." Mercer explained that this method was "not a completely unusual" means of "provid[ing] a value for a company that has subsidiaries," and of "allocat[ing] that value between the subsidiaries based upon relative economic contribution." Mercer also noted, however, that in identifying this valuation method, he was "not talking about a purchase price allocation," but was rather applying an "interpretation" of the agreement between Highstar and ADS "from business and valuation perspectives," including a calculation of the "price increment for the relative attractiveness of Federal Road as a part of the [Highstar-ADS] Transaction."

15

These contentions are contrary to well-established law that a party "'cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first.'" *In re Sonus Networks Shareholder Derivative Litigation*, 422 FSupp.2d 281, 293 (III) (3) (D. Mass. 2006), quoting 18 Moore's Federal Practice § 132.02 [2] [d] (punctuation omitted); see also Restatement (Second) of Judgments, § 27, comment c (when a party has litigated an "ultimate fact," and when that issue has been decided, "new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact.") Etowah proffers Mercer's testimony without explaining why that testimony could not have been offered in its initial action against ADS. Even with such an explanation, however, the ultimate factual issue of the value of Etowah's Federal Road shares as a factor in the number of ADS shares it should have acquired has been previously litigated by the parties to the ADS action and decided by the arbitration panel. As a result, Etowah is barred from raising that issue in this second action against Highstar.

In short, Etowah's acceptance of an award of over $20 million in the wake of the arbitration panel's decision as to the ultimate issue of Federal Road's value thus precludes the re-litigation of that issue in its second action, which features a new fraud claim against a new defendant (Highstar) based on a new expert's admittedly

16

"unusual" methodology for calculating the damages Etowah suffered. The voluminous record before us, including the arguments and decision of the arbitration panel, authorizes the trial court's factual determination that Etowah was accorded a full and fair opportunity to litigate the issue of Federal Road's value in its action against ADS, and that the issue of how much Etowah should have received for its share of Federal Road was actually decided in the arbitration. Because the issue of Federal Road's value "may not be re-litigated, even as part of [Etowah's new fraud] claim" against Highstar, the trial court did not err when it granted Highstar summary judgment on that issue. *Body of Christ Overcoming Church of God*, supra, 287 Ga. at 487-488 (affirming grant of summary judgment on the ground of collateral estoppel rather than res judicata when the issue raised in plaintiff's new action "had been resolved on the merits in prior litigation"); see also *Corey v. New York Stock Exchange*, 691 F2d 1205, 1213 (II) (6th Cir. 1982) (imposing collateral estoppel to bar plaintiff's reasserted claims as to an issue already decided in arbitration with another defendant; plaintiff "may not transform what would ordinarily constitute an impermissible collateral attack into a proper independent direct action by changing defendants and altering the relief sought").

2. Etowah also argues that the trial court erred when it granted summary judgment as to Etowah's claims against Highstar because the issue of attorney fees and expenses incurred by Etowah due to Highstar's concealment of its role in the fraud on Etowah was not decided in the arbitration. We agree.

(a) Pointing to the arbitration panel's denial of Etowah's request for fees, Highstar argues that the issue of all fees arising from the ADS acquisition was determined in the earlier suit such that Etowah is estopped from seeking them against Highstar. But the doctrine of collateral estoppel precludes only "the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies." *Body of Christ*, 287 Ga. at 486. But Highstar was not a party to Etowah's suit against ADS and Appleby, and could not have been made a party to the arbitration that followed, even after evidence as to Highstar's role in deceiving Etowah was discovered. See OCGA §§ 9-9-2 (c) (Georgia Arbitration Code "shall apply to all disputes in which the parties thereto have agreed in writing to arbitrate," with certain exceptions not applicable here), 9-9-6 (b) (1) ("a party who has not participated in [an] arbitration . . . may apply to stay arbitration" on grounds including that "(1) [n]o valid agreement to submit to arbitration was made"); see also *Tillman Park, LLC v. Dabbs-Williams Gen.*

18

*Contractors*, 298 Ga. App. 27, 32 (679 SE2d 67) (2009) (owner of LLC who was not a party to the LLC's contract with plaintiff could not move to compel arbitration under OCGA § 9-9-6 (a)). Further, the issue of the attorney fees and costs incurred by Etowah investigating Highstar's role in the fraudulent acquisition of ADS was not actually settled by the arbitration panel, which decided not to award Etowah its fees and costs *as against ADS* under OCGA § 13-6-11. The panel noted that a decision to award fees under OCGA § 13-6-11 is "discretionary even when there is bad faith"; registered its concern "about Etowah's delay in attempting to circumvent arbitration"; and noted that any allocation of "expenses between successful and unsuccessful claims asserted and those tainted by bad faith" would be "impossible in this case."

It is true that Highstar cannot be liable for any damages, including attorney fees, that were not proximately caused by its own conduct in concealing its fraud from Etowah. See *Whiteside v. Decker, Hallman, Barber, & Briggs*, 310 Ga. App. 16, 18-19 (1) (712 SE2d 87) (2011) ("To establish proximate cause, a [tort] plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury[, and] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.") (citation and punctuation omitted). As a general rule,

19

moreover, "[a]ttorney fees [and expenses of litigation] are recoverable only where authorized by some statutory provision or by contract." *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342, 344 (3) (348 SE2d 628) (1986) (citation and punctuation omitted).

But this Court has repeatedly recognized an exception to this general rule against the recovery of attorney fees and costs: "'attorney fees and expenses of litigation in an underlying action *are* recoverable as real damages incurred as the result of defendants' malfeasance or misfeasance.'" *Atlanta Woman's Club v. Washburne*, 215 Ga. App. 201, 202 (1) (450 SE2d 239) (1994) (emphasis supplied; citations and punctuation omitted), quoting *Marcoux v. Fields*, 195 Ga. App. 573, 574 (1) (394 SE2d 361) (1990).

> The effect of this exception is to put a plaintiff in the same position he would have occupied had the plaintiff not been forced to litigate with a third party[, and] permits a plaintiff to recover all losses flowing from a defendant's alleged misfeasance or malfeasance, except in cases where expenses accrued in the cause of action where recovery is sought.

*Atlanta Woman's Club*, 195 Ga. App. at 202 (citation omitted); see also Restatement, Second, Torts § 914 (2) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third

20

person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action").

To avoid summary judgment on its fraud claim against Highstar, then, Etowah needed only to show that it might be able to prove a single dollar of actual damages arising from Highstar's concealment of its fraud which is not precluded by our holding in Division 1. *Zieve v. Hairston*, 266 Ga. App. 753, 759 (2) (c) (598 SE2d 25) (2004) (a fraud plaintiff must prove that actual damages resulting from the fraud, including any damages "which the law presumes to flow from any tortious act") (citation and punctuation omitted). Here, Etowah has pointed to some evidence that it incurred a "substantial amount" of attorney fees and costs in arbitration as a result of Highstar's failure to produce evidence of its role in the negotiations between Etowah and ADS. Because the issue of Highstar's concealment of its role in the fraud on Etowah was not litigated before the arbitration panel, the decision by the arbitrators not to award Etowah attorney fees as against ADS "is not a bar against the recovery of legal fees and expenses of litigation incurred . . . as a proximate result" of Highstar's own tortious conduct. *Marcoux*, 195 Ga. App. at 576 (authorizing plaintiff to recover attorney fees incurred in plaintiff's first action on the note of the

21

purchasers of plaintiff's condominium as damages in a second action against realtors who counseled plaintiff to accept the note).

(b) Because the trial court erred when it granted Highstar summary judgment on the issue of damages incurred by Etowah in the course of discovering Highstar's participation in its fraudulent acquisition of ADS, the trial court also erred when it concluded that Etowah was not authorized as a matter of law to recover punitive damages pursuant to that claim. *Bedsole v. Action Outdoor Advertising JV*, 325 Ga. App. 194, 202 (4), n. 28 (750 SE2d 445) (2013) (reversing grant of summary judgment as to claim for punitive damages when grant of summary judgment as to breach of fiduciary duty was also reversed); see also *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F3d 488, 494 (2) (2d Cir. 2004) (plaintiff who prevailed in arbitration with first fraudster may seek punitive damages against second fraudster in a new action; "even if collateral estoppel bars [plaintiff] from relitigating the amount of its loss against [the first fraudster], such a determination should not necessarily preclude *punitive* damages" against the second fraudster) (emphasis supplied).

3. Etowah also argues that the trial court erred when it denied Etowah's motion to compel the production of over 1800 documents written by or addressed to

22

"consultants" to Highstar on the ground that the documents were protected by the attorney-client privilege. We disagree.

We review a trial court's decision as to discovery matters, including the application of the attorney-client privilege, only for an abuse of discretion. *De Castro v. Durrell*, 295 Ga. App. 194, 204-205 (3) (671 SE2d 244) (2008) (trial court did not err in denying motion to compel the production of 77 documents as protected by the attorney-client privilege or not reasonably calculated to lead to admissible evidence).

Although Etowah argued below and repeats on appeal that some of the documents could yield evidence of what Highstar actually paid for Federal Road, Highstar's counsel submitted affidavits attesting that the documents in question were generated by counsel's agents in the course of the representation. The trial court held that these documents were privileged because Highstar's communications to the outside consultants were "sufficiently connected to the provision of legal advice" to render the documents part of a "network of agents and employees of both the attorney and the client" used "to facilitate [Highstar's] legal representation." See *St. Simons Waterfront, LLC v. Hunter, MacLean, Exley & Dunn, P.C.*, 293 Ga. 419, 422 (1) (746 SE2d 98) (2013) ("once an attorney-client relationship has been duly established between an attorney and his corporate client, the legal advice confidentially

23

communicated to the authorized agents of the client is by statute protected from discovery") (citation and punctuation omitted).

Although Etowah asserts that the trial court erred in failing to hold an in camera hearing concerning the documents, it has failed to cite any specific page of the record showing that it requested such a hearing, and has also failed to cite to any part of Highstar's privilege log, which presumably details the authors and recipients of some of the documents described in counsel's affidavits. Because Etowah has thus failed to show error by the record as required by Rule 25 (c) (2), we deem this assertion of error abandoned. See *Rice v. Lost Mountain Homeowners Assn.*, 288 Ga. App. 714, 716-717 (4) (655 SE2d 214) (2007).

*Judgment affirmed in part and reversed in part. Andrews, P. J., concurs. Miller, J., concurs in judgment only.*